**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Chanan Nathan Pasik, individually and on behalf of others similarly situated ) ) ) | |
| ) | CASE NO. 19-2357 |
| ) | |
| ) | JUDGE |
| Plaintiff, ) | |
| ) | |
| ) | |
| vs. ) | |
| ) | CLASS ACTION COMPLAINT |
| ) | (JURY DEMAND) |
| Boon Technologies, LLC ) | |
| 9415 Neils Thompson Dr. ) | |
| Austin, TX 78758-7652 ) | |
| ) | |
| Wondercide, LLC ) | |
| 9415 Neils Thompson Dr. ) | |
| Austin, TX 78758-7652 ) | |
| ) | |
| Stephanie Lynn Boone ) | |
| 9415 Neils Thompson Dr. ) | |
| Austin, TX 78758-7652 ) | |
| | |
| Defendants. | |

## INTRODUCTION

1.     This case is about marketplace deception:

> Deception permeates the American marketplace. Deceptive marketing harms consumers' health, welfare and financial resources, reduces people's privacy and self-esteem, and ultimately undermines trust in society.[1]

---

[1] Deception In The Marketplace: The Psychology of Deceptive Persuasion and Consumer Self-Protection (1st Edition 2009).

Defendants deceived Plaintiff in the ubiquitous e-commerce transaction on Amazon website "www.amazon.com" (the "Site"), wherein Defendants advertised, offered to sell, and sold to Plaintiff "Wondercide Flea & Tick Control," aka Wondercide Flea and Tick and Mosquito Control Spray for Cats Dogs and Home, aka Natural Flea & Tick Spray for Pets + Home (the "Product").[2]

2.      Movement to "natural" and "green" consumer products is apparent in the entire cross section of consumer purchasing, be it fabrics, cosmetics, food, personal care products, medicine or other item bought for family and household use. This growing market segment seeks "natural" and "green" for reasons of personal health and ethical living.  With this demand for the "natural" comes an occasion for profit-driven marketers to deceive consumers as to product features that the consumer cannot verify on her own. "As scientific literature is inherently vulnerable to misinterpretation by the general public, health and safety claims made by marketing campaigns do not always align with the latest peer-reviewed scientific evidence."[3]

3.      Insecticide and pesticide sales, cleaning products and air fresheners are areas of the consumer marketplace where "under the radar" deception can be practiced with a small likelihood of detection.  The FTC Act, 15 U.S.C. §45 et seq. and the 50 Little FTC Acts of the States were enacted specifically with a view to the general unlikelihood of consumer deception detection and the public's need for remediation.

---

[2] Product comes in various sizes from 4 oz. to 128 oz. and in Peppermint, Lemongrass, Cedar and Rosemary.  This action embraces all sales of Product, regardless of size or fragrance.

[3] "Human and Environmental Toxicity of Sodium Lauryl Sulfate (SLS): Evidence for Safe Use in Household Cleaning Products (Nat'l Inst. of Health  2015)," reprinted at

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4651417/

New York specifically incorporates FTC guidance and Federal Court precedent thereunder.  N.Y.G.B.L. §349(d).

4.     Defendants' labeling and advertising of the Product, in word and deed, makes the following deceptive representations and claims:

- 100% NATURALLY DERIVED

- Product is the "safest product possible"

- Wondercide natural products replace chemical treatments and other toxins

- There are no chemicals, synthetic pesticides or toxic ingredients

- Safe around children  . . . no toxic effects to pets or children

- Safe for daily use.

- One need not concern herself should the Product come into direct contact with a small child, let alone an adult (see conduct described in next paragraph)

5.     Defendant's marketing material uses multi-media, in addition to express statements, to impress consumers with Product's purportedly safe and benign properties when, for example, Mommy high-fives her preschooler, who is entrusted with Product container, while actual Product remains on Mommy's hand from a just-completed, generous, hand-applied Product application to pet:



Mommy also has an infant in her lap ostensibly helping Mommy apply the substance and coming into immediate contact with a freshly treated pet, intermittently flashing the words "NATURAL" and "SAFE" across the screen:[4]



---

[4] Discovery will determine whether, indeed, Ms. Boone's children contacted the Product or, more likely but deceptive, neither child was subjected to the Product.

6.      BTL variously describes the Product, stating "Natural,' "All Natural"

and/or "100% Naturally Derived:"[5]

**Wondercide All Natural Flea and Tick and Mosquito Control Spray for Cats Dogs and Home-Cedar-128 oz**



7.      Every Product label represents "Natural," and/or "100% Naturally

Derived," and "Safe:"



---

[5]
https://www.amazon.com/s?k=Wondercide+All+Natural+Flea+and+Tick+and+Mosquito+Control+Spray+for+Cats+Dogs+and+Home-Cedar&ref=nb_sb_noss

8.      No matter the consumer's encounter, whether online or in store, every consumer is, as Plaintiff was, exposed to BTL's claims in its advertising and/or on the labeling itself that the Product is (i) Safe, (ii) 100% Naturally Derived and (iii) devoid of synthetic pesticides ((hereinafter at times the "Safe Claim," "100% Natural Claim," and "No Synthetics Claim").

9.      The "Safe Claim," the "100% Natural Claim," and the "No Synthetics Claim" are false, materially misleading and deceptive.

10.     In fact, the Product contains two synthetic chemical substances, the first of which is Sodium Lauryl Sulfate ("SLS"), a surfactant or cleaning ingredient. SLS is created industrially by mixing lauryl alcohol with sulfuric acid, and then adding sodium carbonate.  It does not naturally occur in nature.

11.     SLS' bi-fold purpose is to reduce the surface tension of water and, according to BTL, "[a]lso repels fleas & ticks."[6]  Because SLS, a synthetic chemical, controls pests, it is a synthetic pesticide by definition.  See *"Basic Information about Pesticide Ingredients". US Environmental Protection Agency. Apr 2, 2018. Retrieved Dec 1, 2018.*  BTL repeatedly represents Product to be devoid of chemicals and synthetic pesticides.

12.     SLS is linked to skin irritation, allergic reactions, dermatitis, and dryness. To summarize one expert's view of SLS:[7]

> SLS causes damage to the outer layer of skin by disrupting the function of skin proteins and causing itchy, cracked, and dry skin. Journal of the American College of Toxicology (1983, Vol. 2, No. 7).  Sodium lauryl sulfate causes 'severe epidermal changes' to the area of the skin where it was applied.  SLS 'appears to be safe in formulations designed for

---

[6] https://www.wondercide.com/ingredients
[7] https://www.bewell.com/blog/sodium-lauryl-sulfate-from-coconut-is-it-safer/

> *discontinuous, brief use followed by thorough rinsing from the surface* of the skin. In products intended for prolonged contact with skin, concentrations *should not exceed 1 percent*.'  Coconut oil as well as petroleum can yield the lauryl alcohol by means of an elaborate *chemical* process that liberates the fatty acids, then hydrogenizes the oil, then pulls out the lauryl alcohol.  No matter where the alcohol comes from, it's still mixed with the other chemicals to produce SLS. The result is still a chemical that is a long way from the original coconut oil.  The whole "coconut-derived" or "from coconut oil" or whatever verbiage you see on the label is a marketing gimmick to make you believe that somehow the ingredient is more natural. Don't fall for it!  (Italics ours)

13.    The Product contains 2.2% SLS and is represented as safe under daily use. Such representations contradict the "safe" level, i.e. discontinuous use at >1%, identified by Journal of the American College of Toxicology, Volume 2, Number 7, pp. 127-181, 1983.  BTL does not disclose that its "Safe" representations are at odds with the scientific community.

14.    BTL also recommends use of airborne Product in the yard and throughout the home, which adds to the consumer's unwitting exposure to SLS.  ("For an active pest issue, we recommend treating your pets and your entire home, and treating outdoor areas with Flea & Tick Control for Yard + Garden.")

15.    BTL does not instruct the consumer to thoroughly rinse Product residue from skin surfaces following application, despite instructing consumers to apply Product with bare hands.  This is malicious conduct calculated to assuage concerns a prospective purchaser may have as to product use.

16.    BTL widely publicizes Product as follows: "100% NATURALLY DERIVED.  Wondercide products are free of artificial colors, fragrances, and synthetic pesticides," yet Product is or contains a synthetic pesticide by definition.  See ¶11, *supra.*

Defendant's advertising singles out Cedar Oil, as *the* active ingredient, while representing the Product as a "100% Naturally Derived" . . . ," all the while omitting to mention Sodium Lauryl Sulfate, a synthetic, active ingredient in the Product's pesticide profile. Indeed, Defendant defines SLS as "Coconut Oil" in its glossary.[8] Concealing a synthetic ingredient and defining such chemical as "coconut oil," while highlighting a natural ingredient in an alleged "100 Naturally Derived" product, is an additional deceptive act and practice under Section 349 of the New York Business Code. The second synthetic chemical in Product is Ethyl Lactate, a monobasicester formed from lactic acid and ethanol, commonly used as a solvent.  Further investigation may yet uncover additional synthetic substances in Product.

**JURISDICTION AND VENUE**

17.    The claim asserted herein arises under the laws of the State of New York.

18.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the matter in controversy, upon information and belief, exceeds $5,000,000, exclusive of interest and costs, and this is a class action in which certain of the Class members and Defendant are citizens of different states.  Additionally, this Court has diversity jurisdiction under 28 U.S.C. § 1332 (a) because the parties are of diverse citizenship and more than $75,000.00 is in controversy.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the acts and transactions alleged herein, including the marketing, advertising, purchase of the Product at issue, occurred in Kings County, New York.

20.    Personal jurisdiction in this District exists under CPLR 302(a)(1).

---

[8] https://www.wondercide.com/ingredients

## PLAINTIFF'S FACTS

21.    Plaintiff Chanan Nathan Pasik, a dog owner seeking to protect his dog from seasonal infestations of fleas and ticks, is a resident of Brooklyn, New York, who purchased from BTL a container of "Product" online, on amazon.com., on or about March 15, 2019.  Plaintiff read and saw the video representing Defendants' Safe Claim, 100% Natural Claim and No-Synthetics Claim, including the following from the Product label and other of BTL's content on amazon.com:[9]



- **SAFE**
- KILLS THE FLEA & TICK LIFECYCLE! Wondercide offers a safe & effective alternative to monthly chemical treatments like drops, pills, bombs, dips & sprays.
- FRESH LEMONGRASS SCENT: with aroma therapeutic qualities: Revitalizing, Invigorating, Uplifting! No Clove, pyrethrins or toxic ingredients. Kills and repels fleas, ticks & mosquitoes.

---

[9] https://www.amazon.com/Wondercide-Flea-Mosquito-Control-Spray/dp/B01M8GFPXG?th=1

- BEST USE: Spray our natural flea treatment directly on your pet. Our lemongrass home flea treatment helps make your pet's coat shiny and brilliant.
- SAFE FOR DOGS & CATS OF ALL AGES AND SIZES. Safe when used as directed. pH balanced for healthy skin & coat. For cats and small dogs, our 4oz size is most appropriate applicator.
- 100% NATURALLY DERIVED & MADE IN THE USA. Human-grade ingredients. Safe around children when used as directed.

22.    Plaintiff purchased the Product based materially on ¶23's quoted representations, to wit: Safe, 100% Naturally Derived, no toxic ingredients.

23.    Plaintiff used Product several times to spray his dog.

24.    When Plaintiff made his purchase, he did not know the Product was not "100% Natural" as advertised.  Upon reading BTL's Amazon advertisement, Plaintiff believed that the Product contained only natural ingredients, i.e. no synthetics (as advertised).

25.    Plaintiff did not see the Product's actual ingredients on amazon.com because the ingredients were not readily disclosed conspicuously as part of the webpage image. The ingredients appeared well below the Product details and purchase-option button; and the consumer must scroll down a number of screens to reach the ingredients disclosure, including scrolling through irrelevant matter, which Plaintiff did not do.

26.    Upon using the Product and with its container in hand, Plaintiff noted the ingredients listed on the product container.  He researched the ingredients disclosed on the container and learned that Sodium Lauryl Sulfate is not a natural substance but, rather, a toxic chemical.

27.    Once aware of Product's synthetic ingredient and its harm-causing potential, Plaintiff was appalled and seeks to effect through this suit relief attendant to Defendant's unfair and deceptive practices.

## DEFENDANT'S FACTS

**A.     Brief Statement of BTL's History and Role in Marketplace**

28.     BTL dba Wondercide LLC[10] is a Texas Corporation, formed in 2008, with its principal place of business at 9415 Neils Thompson Dr, Austin, Texas  78758.

29.     BTL operates a proprietary website at https://www.wondercide.com, and a virtual storefront on amazon.com, creating and providing all of the labeling and advertising content at issue herein.  Product's advertising on the two sites is substantially similar.

30.     Stephanie Lynn Boone owns and/or controls the Product brand, being Wondercide.  Ms. Boone is individually responsible for all actions challenged herein as wrongful.

31.     Defendants' conduct harms consumers by inducing them to purchase and utilize the purported 100% Natural Product, on the false premise that it is All Natural and Safe when, in fact, Product contains two ingredients—one demonstrably toxic--that are not natural, and the Product is not "Safe:"

> Since the early 1990s, misconstrued information on the human and environmental toxicity of SLS has led to consumer confusion and concern about the safety of SLS as an ingredient in household products. As scientific literature is inherently vulnerable to misinterpretation by the general public, health and safety claims made by marketing campaigns do not always align with the latest peer-reviewed scientific evidence. *Oftentimes, consumer product claims use language in ways that can be misleading to the average consumer.* Review of the human and environmental toxicity profiles of SLS is warranted to elucidate the known risks and benefits of using SLS in household cleaning product formulation.  (italics added)

See NIH, cited n. 3, *supra*

---

[10] Both entities are duly incorporated, but it appears that BTL is the operative corporation, using Wondercide LLC as a fictitious name/entity.

32.     The National Institute of Health cautions that children in particular should not come into contact with SLS lest they suffer skin and internal injuries:

> The intended application of detergents and cleaners should not result in direct contact with product ingredients; however, misuse of the product could potentially cause dermal (skin and ocular) or inhalation exposure. Oral exposure to cleaning products is unlikely but has occurred – mostly in children – because of accidental ingestion.

*Id..*

33.     BTL's advertised message, bidding pet owners to trust the Product with and directly on small children, is unconscionable and warrants punitive damages.

34.     "100% Naturally Derived" is a material factor in each consumer's selection of Product. Consumers acting reasonably under the circumstances, however, cannot detect the presence of synthetic ingredients prior to sale and, hence, may use the Product for months or years unwittingly.  Such usage may lead to bioaccumulation of toxic material in pets, children and other family members.

35.     Defendants individuated the Product by claiming "100% Naturally Derived" to enable, unjustly, enhanced profitability and market share.

**B.  A Celebrity Company**

36.     On March 18, 2016, Wondercide Founder and CEO Stephanie Boone appeared on ABC's reality show, "Shark Tank," seeking $500,000 in exchange for 5 percent of BTL equity to grow retail distribution of its line of pesticides.

37.     Ms. Boone was successful in securing $500,000 from one of the "Sharks" in exchange for 3% of company equity and a $.50 royalty for every container of Product sold until payoff of the $500,000.

38.     BTL became a celebrity in the pet care milieu, with thousands of orders replacing what had historically been dozens of orders.

39.     Prior to and for a while after the Shark Tank appearance, the Product was indeed 100% natural and devoid of any synthetic chemicals.[11]   Accordingly, BTL gained wide celebrity as an "All Natural" supplier, becoming the second-highest-valued firm in Shark Tank history.

40.     Soon after its Shark Tank appearance BTL reformulated its Product, deleting hydrated silica, a natural substance, and replacing it with SLS and Ethyl Lactate. On information and belief this reformulation lowered per unit cost of production, thus facilitating repayment of the Shark money.

41.     BTL never changed its market messaging and never disclosed the material, qualitative change from "all natural" to synthetic.

42.     Consumers familiar with Product continued to believe BTL was marketing "all natural" Product.  They did not and do not understand that there is a difference between "naturally occurring" and "naturally derived," which purported distinction lies at the root of BTL's deceptive marketing of Product.  New customers such as Plaintiff knew only that this popular Product was 100% Naturally Derived.

43.     BTL used "naturally derived" in a misguided effort to avoid clear FTC precedent prohibiting "All Natural" and "100% Natural." BTL thus sought to manipulate consumer expectations, i.e. deceive consumers into believing Product was free of chemicals when it was not.

---

[11] The Shark Tank appearance is described as underscoring that "their product is natural and has no chemicals."  https://timmceneny.wordpress.com/2016/03/22/shark-tank-episode-aired-march-18-2016/

44.     "100% Naturally Derived" is printed in the advertisement in a distinctive typeface including all upper case lettering, that is clear, conspicuous and proximate to images of the Product so as to be a description of the Product itself.

45.     Any (anticipated) claim that "Derived" modifies or references a product's pre-processed ingredients rather than the product itself is contrary decisional law and plain English.  Suggestive words such as "naturally derived" challenge a customer to imagine the nature of the product itself . . .not any particular component thereof.

46.     At no point does BTL disclose the intervention of chemical processes that catalyze substances nowhere found in nature.

47.     SLS and Ethyl Lactate are artificially created by human beings and have no natural source.  The use of a coconut as one component of SLS to obtain coconut-derived lauryl acid does not mean to an average consumer that SLS is or may be synthetic; indeed, BTL represents precisely that Product is devoid of synthetics and 100% Natural[ly Derived].  The FTC has made clear that an ingredient is synthetic *and not natural* when it does not naturally occur; and what is synthetic, i.e. SLS and Ethanol Lactate, cannot lawfully be marketed as natural.[12]  The FTC has enforced against the clever use of prohibited language in product name or otherwise, to illegally convey the "all natural" message.  BTL's essential statement at issue here, as understood by most reasonable consumers, is that the Product itself "derives 100%" from natural sources or origins, i.e. a "100% Natural" product.  This means that the product is distinguishable from a synthetic product in that no ingredient is *chemically* derived.[13]

---

[12] https://www.consumer.ftc.gov/blog/2016/04/super-unnatural-product-claims
https://www.ftc.gov/system/files/documents/cases/160713shikaicmpt.pdf (at ¶7)
[13] 38 F.R. 20714 (1973), reprinted at
https://advance.lexis.com/r/documentprovider/73h9k/attachment/data?attachmentid=V1,215,104

48.     BTL strengthens its deceptive practice, so as to underscore by implied representation that "100% Naturally Derived"  means the same thing as "100% Natural," by expressly and uniformly disassociating its product with anything toxic, "synthetic" or "chemical:"

**No DEET, pyrethrins, pyrethroids or other chemical pesticides**! Non-staining on pets, bedding, furniture, and flooring. Use on your pet, and spray directly on bedding and surroundings in home.[14]

More than half of the people in the United States are likely to choose foods for special dietary uses that contain ingredients described as "natural" or derived from "natural sources" into the belief that "natural" foods are superior to "synthetic foods."



I love this stuff! It kills fleas instantly and there are no chemicals. It smells great and I can use it on my furniture and outside. LOVE IT!

- Verified Buyer: Kristen S.

---

07,038FR20708a,1&attachmenttype=PDF&attachmentname=OriginalSourceImage&origination=&sequencenumber=&ishotdoc=false&docTitle=

[14] https://www.amazon.com/Wondercide-Natural-Flea-Tick-Control/dp/B00V75QXEY; see also *id*:

49.     BTL violated NYGBL §§349-350, *inter alia,* because:

- Reasonable consumers would expect "100% Naturally Derived' ingredients *not* to contain chemicals made by human beings in a laboratory or other manufacturing facility;
- Reasonable consumers would expect the word "Safe" *not* to include a product containing twice the percentage of SLS accepted in the scientific community as safe;
- Reasonable consumers would expect that a "safe & effective alternative to monthly chemical treatments" would *not* itself contain chemicals with toxic properties;
- Reasonable consumers would *not* expect SLS, defined by BTL as "repels fleas & ticks," to be synthetic when BTL represents Product to contain "no synthetic pesticides;"
- Reasonable consumers would *not* expect the "safest product possible" to contain toxic chemicals at twice the concentration recommended by the scientific community;
- Reasonable consumers would *not* expect a toxic substance to be illustrated in video as safe for elective contact to a woman's small child when the substance contains an unsafe concentration of SLS according to learned scientific papers;
- Reasonable consumers would *not* expect BTL to conceal the need for even adults (let alone children) to thoroughly rinse affected skin areas following anticipated use of a substance that causes severe epidermal changes to the area of the skin where it was applied;

50.     It is the interaction of these and other artifices that permitted (and still permit) BTL to wrongly control and manipulate consumer expectation:[15] In contemporary marketing, managers think in terms of doing integrated marketing communication planning. So when deception is afoot, they will think in terms of doing *integrated deception planning*. Even within a single advertisement or sales presentation, there are "softening up" events, camouflage tactics that surround the deceptive act, and "close out" events that urge a consumer's mind away from the deceptive act to keep it unrecognized as such. So, we ultimately have to understand two things: (a) the specific acts that can

---

[15] See "Deception in the Marketplace," cited n.1 *supra* at p.41.

deliver a deception, and (b) the strategic sequencing of the acts that precede, surround, and follow deceptive acts to make them work.

BTL's use of small children in joyful, direct contact with the Product, and its repeated assurances that the Product is "safe around children when used as [thus] directed" is an unconscionable "softening up" of the consumer and part of a sequence of "*integrated deception planning.*"

## PRIOR FEDERAL TRADE COMMISSION PROCEEDINGS CONCERNING "ALL NATURAL" AND "100% NATURAL" CLAIMS

51.     The Federal Trade Commission has made clear in its official pronouncements, rules and orders that it is false and deceptive to advertise or package a product as "All natural" or "100% Natural" if it contains one or more synthetic products. https://www.ftc.gov/news-events/blogs/business-blog/2016/04/are-your-all-natural-claims-all-accurate.

52.     "Synthetic" and "Natural" are mutually exclusive under FTC jurisprudence; and *contra* disclosures will not legitimize "100% Naturally Derived" unless "effective to dispel the net impression otherwise presented."[16]

53.     The Federal Trade Commission has made clear in its official pronouncements, rules and orders that "[i]f companies market their products as 'all natural' or '100% natural,' consumers have a right to take them at their word." *Id.*

54.     The Federal Trade Commission has provided a uniform prerequisite of "All Natural" and "100% Natural," i.e. zero synthetic ingredients.

---

[16] https://www.ftc.gov/system/files/documents/cases/161212_docket_no_9370_california_naturel_op inion_of_the_commission.pdf

55.     As a significant player in the household products industry, BTL is keenly aware of its regulatory environment and the risks associated with non-compliance.

56.     Defendants have violated the law for years, have not heeded the FTC's warnings, and have found great financial success in deceiving the public.

## INJURY AND DAMAGES

57.     Plaintiff brings this lawsuit for damage relief, individually and on behalf of a New York Class, pursuant to NYGBL Sections 349-350, to recover statutory or actual damages as therein provided.

58.     Based on Defendant's Safe Claims and 100% Natural Claims and No-Synthetics Claims, Plaintiff and the Class paid for and were entitled to receive 100% Naturally Derived Product and a product devoid of synthetic substances.  Instead of receiving such a product, however, Plaintiff and the Class received Product containing synthetic chemicals.  Such a product is worth ascertainably less than 100% Natural product.  What Plaintiff and the putative class did receive was worth ascertainably less than that for which they paid.

59.     Had Plaintiff known of the Product's chemical content, he would not have purchased the Product, and certainly not at the price paid.

60.     Plaintiff paid a premium for Product by reason of false representations and claims.  Similar products that do not lay claim to 100% Natural charge ascertainably less for substantially similar product, e.g. Ultra Cruz Cannnine Natural Flea & Tick Spray (16 oz.),[17] is priced at $4.95; Natural Chemistry's  Natural Flea & Tick Spray for Dogs (24

---

[17] https://www.scahealth.com/scah/product/ultracruz-canine-natural-flea-and-tick-spray-dog?gclid=EAIaIQobChMIvb-Y7tyO4QIVygOGCh3rMQO8EAQYASABEgL5SPD_BwE
**Error! Main Document Only.**Sodium lauryl sulfate 3.8%
Geraniol 1%

oz.) prices at $9.89;[18]and Vet's Best Flea + Tick Spray for Dogs (8 oz.) prices at $6.69[19]

Not one of these three (3) substantially similar suppliers claims 100% natural content or

the absence of chemicals; and each sells 16 ounces of its substantially similar product for

at least $12.00 per 16 oz. less than BTL. Plaintiff and each class member suffered injury

equal to the premium paid for Product, i.e. at least $.75 per ounce purchased.

61.     The same analysis is applicable to other sizes of Product, e.g. Ultra Cruz

Cannnine Natural Flea & Tick Spray (32 oz.) sells for $8.95[20] while Product (32 oz.) sells

---

Clove Extract 0.5%
Peppermint Oil (Mintoil) 0.25%
Citronella Oil 0.06%
Cedarwood Oil 0.05%
Lemongrass Essential Oil 0.05%
Oil of Rosemary 0.05%
**Inactive Ingredients:** Water, Glycerin

[18] https://www.amazon.com/Natural-Chemistry-Flea-Spray-16-Ounce/dp/B006HOBCLO

| ACTIVE INGREDIENTS: | |
| --- | --- |
| Sodium Lauryl Sulfate | 1.20% |
| Cinnamon Oil | 0.50% |
| Cedar Oil | 0.20% |
| Clove Oil | 0.20% |
| Other Ingredients: | 97.90% |
| Water, Vanillin (benzaldehyde, 4-hydroxy-3-methoxy-) | |
| Total | 100.00% |

[19] https://www.chewy.com/vets-best-flea-tick-spray-dogs-8-oz/dp/45156?utm_source=google-product&utm_medium=cpc&utm_campaign=hg&utm_content=Vet%27s%20Best&utm_term=&gclid=EAIaIQobChMI5_vDmOqO4QIVvwwOGCh2I9AFdEAQYAyABEgLHGvD_BwE



[20] https://www.scahealth.com/scah/product/ultracruz-canine-natural-flea-and-tick-spray-dog?gclid=EAIaIQobChMIvb-Y7tyO4QIVygOGCh3rMQO8EAQYASABEgL5SPD_BwE

at the premium price of $34.95.  Each class member purchasing a container of Product

(32 oz.) paid a premium of $26, or about $.80 per ounce. To purchase a gallon of the

former one pays $35.80 as contrasted with $99.99 for a gallon of Wondercide.  Each class

member purchasing a one-gallon container of the Product paid a premium of $63, or

about $.50 per ounce purchased. Thus, no matter what fragrance/size Product a class

member may have purchased, she was injured by an ascertainable amount of money per

ounce purchased.

## CLASS ACTION ALLEGATIONS

62.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of

Civil Procedure, on behalf of himself and a Class he seeks to represent for damages,

defined as:

> All consumers who purchased the Product in New York within any
> applicable limitations period before the filing of this complaint
> until the date of class certification. Excluded from the Class are
> any of Defendants' officers, directors, or employees; officers,
> directors, or employees of any entity in which Defendant currently
> has or has had a controlling interest; and Defendants' legal
> representatives, heirs, successors, and assigns.

63.     As used herein, the term "Class Members" shall mean and refer to the

members of the Class described above.

64.     Plaintiff reserves the right to amend the Class definition, and to add

classes or subclasses, as warranted by facts discovered.

65.     Class-wide treatment is appropriate because Plaintiff can prove the

elements of his claim on a class-wide basis using the same evidence as would be used to

prove those elements in individual actions alleging the same claim, not one unit of Product was "100% Naturally Derived" or "Safe."

66.     Numerosity—Federal Rule of Civil Procedure 23(a)(1). The members of the Class are so numerous that joinder is impracticable. Upon information and belief, there are tens of thousands of individual class members who purchased the Product. The precise number of class members is unknown to Plaintiff, but may be ascertained, including by objective criteria.  Most class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, including email.

67.     Commonality and Predominance—Federal Rules of Civil Procedure 23(a)(2) & 23(b)(3). This action involves common questions of law or fact, which predominate over any questions affecting individual members of the Class. Common questions include:

- Whether BTL's representation of "100% Naturally Derived" is false, misleading or otherwise deceptive;
- Whether BTL's representation of "Safe" is false, misleading or otherwise deceptive;
- Whether BTL's representation of "No Synthetics" is false, misleading or otherwise deceptive;
- Whether "100% Naturally Derived," "Safe" or "No Synthetics" is/are material representations;
- Whether reasonable consumers would expect "100% Naturally Derived' ingredients *not* to contain chemicals made by human beings in a laboratory or other manufacturing facility;
- Whether reasonable consumers would expect the word "Safe" *not* to include a product containing twice the percentage of SLS accepted in the scientific community as safe;
- Whether reasonable consumers would expect that a "safe & effective alternative to monthly chemical treatments" would *not* itself contain chemicals with toxic properties;
- Whether reasonable consumers would *not* expect SLS, defined by BTL as "repels fleas & ticks," to be synthetic when BTL represents Product to contain "no synthetic pesticides;"

- Whether reasonable consumers would *not* expect the "safest product possible" to contain toxic chemicals at twice the concentration recommended by the scientific community;
- Whether reasonable consumers would *not* expect a toxic substance to be illustrated in video as safe for a preschooler and infant direct contact when the substance contains an unsafe concentration of SLS according to learned scientific papers;
- Whether reasonable consumers would *not* expect BTL to conceal the need for even adults (let alone children) to thoroughly rinse hands following anticipated use of a substance that causes severe epidermal changes to the area of the skin where it was applied;
- Whether Defendant violated Sections 349-350 of New York Business Code;
- Whether Defendant's marketing and pricing of Product causes reasonable consumers to pay more for Product than for a comparable product not claimed to be "100% Naturally Derived" and/or "Safe;"
- Whether Product's retail premium differential is reasonably ascertainable and the amount thereof;
- Whether Plaintiff and members of the New York Class are entitled to statutory damages of $50 per class member under Section 349(h); and
- Whether Plaintiff and the members of the National Class are entitled to actual damages.

68.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other members of the Class. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

69.     Typicality—Federal Rule of Civil Procedure 23(a)(3). Plaintiff's claim is typical of the claim of the other members of the Class because, among other things, all members of the Class were comparably injured through the uniform misconduct described above and were subject to Defendant's false, deceptive, misleading, and unfair labeling and marketing practices, including the false claims that the Product is 100% Naturally Derived, Safe and devoid of synthetic substances. Further, there are no

22

defenses available to Defendant unique to individual Class Members.

70.     Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4). Plaintiff is an adequate representative of the members of the Class because her interests do not conflict with the interests of the other members of the Class she seeks to represent; she has retained competent counsel with experience in complex class action litigation; and Plaintiff will prosecute this action vigorously. Class Members' interests will be fairly and adequately protected by Plaintiff and her counsel.

71.     Superiority—Federal Rule of Civil Procedure 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Class to seek redress for Defendant's wrongful conduct on an individual basis. Individualized litigation would also pose the threat of significant administrative burden to the court system. Individual cases would create the potential for inconsistent or contradictory judgments and would increase delay and expense to all parties and the court system. By contrast the class action device presents far fewer management difficulties and provides the streamlined benefits of singular adjudication and comprehensive supervision by one court. Given the similar nature of the class members' claims, the Class will be easily managed by the Court and the parties and will be managed more efficiently in this integrated class action than through multiple separate actions.

**CLAIM FOR RELIEF**

**New York Consumer Protection from Deceptive Acts and Practices Act**
**(N.Y. Gen. Bus. Law §§ 349-350)**
**On Behalf of the Class**

72.     Plaintiff re-alleges all preceding allegations as though set forth at length.

73.     New York General Business Law ("NYGBL") §§349 provides:

"Deceptive acts or practices in the conduct of any business, trade or commerce or the furnishing of any service in this state are hereby declared unlawful."  Section 350 provides "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

74.     Defendant's representations of its Product are consumer oriented.

75.     As above alleged, Defendant engaged in deceptive acts and practices within the meaning of NYGBL §§349-350, vis-à-vis statements on the label, advertising and marketing as follows: the Product is "100% Naturally Derived" was deceptive, as alleged *inter alia* in ¶¶4 and 23 above.

76.     As above alleged, Defendant engaged in deceptive acts and practices within the meaning of NYGBL §§349-350, vis-à-vis statements on the label, advertising and marketing as follows: the Product is "Safe" was deceptive, as alleged *inter alia* in ¶¶4 and 23 above.

77.     As above alleged, Defendant engaged in deceptive acts and practices within the meaning of NYGBL §§349-350, vis-à-vis statements on the label, advertising and marketing as follows: the Product is free of synthetic ingredients was deceptive, as alleged *inter alia* in ¶¶4 and 23 above.

78.     Plaintiff read and reviewed the labeling and advertising, i.e. advertising on

24

screens above irrelevant matter, including the video, prior to purchase, noted all of the representations referenced in ¶¶4, 23 above, and alleges that they were material to Plaintiff's decision to purchase Product.

79.     Defendant violated NYGBL §349-350 and, as a consequence of such misconduct, Plaintiff and the other members of the Class suffered injury and have been damaged in an amount equal to the greater of the (i) the amount of premium paid for the Product (¶62-63*supra*) or $50, whichever is greater.

WHEREFORE Plaintiff, on behalf of himself and the Class prays as follows:

a.   An order certifying this case as a class action, designating Plaintiff as the representative of the Class and his counsel as class counsel;

b.   Statutory damages of $50 per Class member pursuant to N.Y.G.B.L. §349(h), save and except where class members have and elect actual damages in excess thereof;

c.   Punitive damages;

d.   Attorney fees; and

e.   Costs.

/s/ Mark Schlachet_____
Mark Schlachet
3515 Severn Road
Cleveland, Ohio 44118
(216) 225-7559
(216) 932-5390(f)
markschlachet@me.com

*Attorney for Plaintiff Chanan Pasik and the Putative Class*

25